

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Josefina Pantoja Oquendo, et als.<br><br>Recurridos<br><br>v.<br><br>Municipio de San Juan, Policía Municipal de San Juan, Hilton Cordero<br><br>Peticionarios | Certiorari<br><br>2011 TSPR 8     2<br><br>182 DPR _____ |

Número del Caso:   CC        - 2010 - 805

Fecha: 9 de junio de 2011

Tribunal de Apelaciones:

Región Judicial de San Juan, Panel III

Panel integrado por su presidente el Juez Ramí                rez Nazario y los Jueces Piñero González y Figueroa Cabán

Abogados de la Parte Peticionaria:

Lcdo. Eliezer Aldarondo Ortiz
Lcda. Rosa Campos Silva
Lcdo. Simone Cataldi Malpica
Lcdo. Eliezer A. Aldarondo López

Abogados de la Part        e Recurrida:

Lcdo. José J. Nazario de la Rosa
Lcdo. Luis José Torres Asencio
Lcdo. Harry Anduze Montaño
Lcdo. José A. Morales Boscio

Materia:     Entredicho Provisional, Injuction Preliminar y Permanente y Sentencia Declaratoria

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a                la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Josefina Pantoja Oquendo, *et als.*<br>Recurridos<br><br>v.<br><br>Municipio de San Juan, Policía Municipal de San Juan, Hilton Cordero<br>Peticionarios | Certiorari<br><br>CC-2010-0805 |

Opinión del Tribunal emitida por el Juez Asociado señor Rivera García

En San Juan, Puerto Rico, a 9 de junio de 2011.

I

Como parte de una campaña educativa del Movimiento Amplio de Mujeres de Puerto Rico (MAMPR), en horas de la mañana del 3 de julio de 2010 las señoras Josefina Pantoja Oquendo; Leila G. Negrón Cintrón; Sara Benítez Delgado; y Nitza I Meléndez Nieves, se encontraban en la Ave. 65 de Infantería, a la altura de la Barriada Buen Consejo y frente a una pared contigua al Colegio San José. Ello, con el fin de pintar un mural sobre dicha pared y manifestar su repudio al número alarmante de mujeres que han muerto a manos de sus parejas.

Ese mismo día el entonces Comisionado de la Policía Municipal de San Juan, Sr. Hilton Cordero, y un grupo de policías municipales se vieron precisados a intervenir con las señoras Pantoja Oquendo, Negrón Cintrón, Benítez Delgado y Meléndez Nieves, por entender que éstas actuaban en violación del Art. 5.09, inciso B-9, de la Ordenanza Municipal Núm. 7 del Código de Urbanismo del Municipio de San Juan, serie 2002-03.[1]  Por ello expidieron las multas administrativas correspondientes.

---

[1] El inciso B-9 del Art. 5.09 de la Ordenanza Municipal Núm. 7 del Código de Urbanismo del Municipio de San Juan, serie 2002-03, dispone lo siguiente:

"B. Limpieza y cuido de los espacios públicos

Toda persona natural o jurídica en el Municipio de San Juan deberá observar las siguientes normas de limpieza y cuido de espacios públicos:

.    .    .    .    .    .    .    .    .

9. Ninguna persona por sí o a través de otra, pegará, fijará, imprimirá, o pintará sobre propiedad pública, incluyendo recipientes de desperdicios y demás elementos del mobiliario urbano, superficies exteriores de los edificios, vías públicas y su mobiliario urbano, elementos de señalización, aceras, muros, paredes del área pública o sobre cualquier propiedad privada, sin el consentimiento del custodio, dueño o encargado, cualquier aviso, rótulo, anuncio, letrero, cartel, grabado, pasquín, cuadro, escrito, dibujo, figura, graffiti, pintura, o cualquier otro medio similar, no importa el asunto, artículo, persona, actividad, tema, concepto o materia a que se haga referencia en los mismos, sin la debida autorización del Departamento de Urbanismo.  Dicho Departamento podrá autorizar aquellas medidas de publicidad relacionadas con actividades que se desarrollen en propiedad municipal o privada donde se celebre la actividad o con festivales o fiestas tradicionales que hayan sido expresamente autorizadas por el Municipio y aquellas de carácter artístico.  Disponiéndose que esta prohibición no aplicará a los tablones de expresión pública, a las zonas históricas que están reguladas por el Reglamento de Planificación Número 5, "Reglamento de Sitios y Zonas Históricas de Puerto Rico", ni a rótulos y letreros en las vías públicas los cuales estén regulados por el Reglamento de Planificación Número 6, "Reglamento de Anuncios y Rótulos en las Carreteras".  Disponiéndose además, que en aquellos casos de avisos, rótulos, anuncios, letreros, carteles, grabados, pasquines, cuadros, escritos, dibujos, figuras, graffitis, pinturas, o cualquier otro medio similar de

A raíz de lo anterior, el 30 de julio de 2010 las señoras Pantoja Oquendo, Negrón Cintrón, Benítez Delgado y Meléndez Nieves presentaron una demanda jurada ante el Tribunal de Primera Instancia en contra del Municipio de San Juan; la Policía Municipal de San Juan; y el Sr. Hilton Cordero, otrora Comisionado de la Policía Municipal de San Juan. En ella, impugnaron de su faz la constitucionalidad del Art. 5.09, inciso B-9, de la Ordenanza Municipal Núm. 7, *supra*, y solicitaron que se declararan nulas las multas expedidas. En la alternativa, también adujeron que dicho artículo era inconstitucional en su aplicación.

Además, junto con la demanda antes mencionada, las recurridas presentaron un escrito intitulado Moción en

índole comercial, se establece la presunción de que el dueño del comercio o promotor de la actividad promocionada o anunciada es el responsable de la colocación de los medios antes mencionados, por lo que en estos casos, se emitirá un boleto a estos personalmente, además del boleto a la persona o corporación que los instala, pinta, pega o coloca. Los boletos se emitirán por cada área física afectada. Se hace claro que nada de lo dispuesto en este apartado podrá, de forma alguna, afectar el derecho a la libre expresión y/o cualquier otro derecho protegido por la Constitución de Puerto Rico y la de los Estados Unidos de América.

Toda persona que incurra en alguna de las conductas prohibidas en los subincisos 6 al 8 será sancionada con multa administrativa de $500.00. Toda persona que incurra en alguna de las conductas prohibidas en el subinciso 9 será sancionada con multa administrativa de $1,000.00, por cada área física afectada. Si esta conducta se llevase en contra de los monumentos, fuentes de agua y obras de arte instaladas en el espacio público, u otros bienes de relevante interés histórico, artístico o cultural, el infractor pagará además, los costos de reponer el bien a su estado original. Si el infractor es un menor de edad[,] se podrá responsabilizar a los padres, tutor o encargados de éste, por el pago de la multa y/o reparación y/o reposición de los daños o costos que incurra el Municipio de San Juan."

solicitud de Entredicho Provisional, *Injunction* Preliminar y Permanente, Remedios Provisionales y Sentencia Declaratoria.  En el petitorio le solicitaron al Tribunal de Primera Instancia que emitiera un entredicho provisional mediante el cual se les ordenara a los peticionarios abstenerse de: (1) poner en vigor el Art. 5.09, inciso B-9, de la Ordenanza Municipal Núm. 7, *supra*; y (2) cobrar las multas impuestas a las recurridas. Solicitaron, además, que se les permitiera continuar colocando el mural en controversia –y otros- en áreas clasificadas como foros públicos tradicionales y foros públicos por designación.

Ese mismo día el Tribunal de Primera Instancia emitió una orden de entredicho provisional.  En ella le ordenó a los peticionarios que desistieran de impedirles a las recurridas "pintar murales como medios de expresión en lugares denominados foros públicos tradicionales o por designación" y señaló una vista para el 10 de agosto de 2010.

Varios días más tarde, y luego de celebrada la vista judicial, el 17 de agosto de 2010 el Tribunal de Primera Instancia dictó sentencia parcial y declaró Ha Lugar el interdicto preliminar solicitado.  Al así proceder, le ordenó a los demandados a abstenerse de interferir con el ejercicio constitucional a la libre expresión de las recurridas.

Inconformes, el 9 de septiembre de 2010 los peticionarios presentaron un recurso de apelación ante el Tribunal de Apelaciones y cuestionaron la validez de la sentencia parcial dictada por el foro primario. A su vez, junto con su recurso de apelación, los peticionarios presentaron una moción urgente y solicitaron que se paralizaran los efectos del interdicto preliminar concedido. Ese mismo día, el foro apelativo intermedio emitió una resolución y les concedió a las recurridas un término de 10 días para que se expresaran sobre los dos recursos presentados por los peticionarios.

Insatisfechos con la referida resolución, el 15 de septiembre de 2010 los peticionarios presentaron un recurso de *certiorari* y una moción urgente ante este Tribunal. En ambos recursos adujeron que el Tribunal de Apelaciones erró al no resolver con premura la moción urgente que se le presentó y al no emitir una orden que paralizara los efectos del interdicto preliminar emitido por el Tribunal de Primera Instancia. Añadieron que, al conceder el término antes mencionado, el foro apelativo intermedio -para todos los fines prácticos- declaró No Ha Lugar la referida moción y desvirtuó su naturaleza urgente. Ello, aun cuando tenía ante sí todos los elementos para disponer sumariamente de la referida moción. En consecuencia, y dada la importancia y envergadura de los derechos e intereses involucrados, nos

solicitaron que paralizáramos los efectos del interdicto preliminar otorgado por el Tribunal de Primera Instancia hasta que el foro apelativo intermedio atendiera y resolviera el recurso de apelación presentado.

Luego de examinar los recursos presentados por los codemandados, el 17 de septiembre de 2010 emitimos una resolución mediante la cual declaramos Ha Lugar la moción urgente y expedimos el recurso de *certiorari* presentado ante este Tribunal. En consecuencia, ordenamos la paralización de los efectos del interdicto preliminar otorgado por el Tribunal de Primera Instancia hasta que el Tribunal de Apelaciones considerara y resolviera el recurso de apelación presentado por los peticionarios.

No obstante lo anterior, el 20 de septiembre de 2010 la Secretaría del Tribunal de Apelaciones recibió de este Tribunal un mandamiento ordenándole que nos remitiera, a la brevedad posible, los autos originales del caso o una copia certificada. A raíz de lo anterior, el 24 de septiembre de 2010 el foro apelativo intermedio se vio precisado a emitir una resolución. En ella razonó que carecía de jurisdicción para atender el recurso de apelación presentado por los peticionarios debido a que este Tribunal había certificado el caso de autos y retenido jurisdicción sobre el mismo.

Así las cosas, y luego que los peticionarios presentaran ante este Tribunal una moción informativa

solicitando que aclaráramos el estado procesal del caso de marras, el 9 de noviembre de 2010 emitimos una subsiguiente resolución. En ella aclaramos que la resolución del 17 de septiembre de 2010 no dispuso del recurso de *certiorari* presentado por los codemandados, por lo que retuvimos la jurisdicción sobre dicho recurso. Asimismo, esclarecimos que la controversia ante nuestra consideración se circunscribe a determinar si era procedente que el Tribunal de Apelaciones paralizara los efectos del interdicto preliminar otorgado por el Tribunal de Primera Instancia, asunto que no fue considerado por el foro apelativo intermedio.

Ambas partes han comparecido y presentado sus respectivos alegatos. Por ello, contando con su comparecencia, procedemos a resolver.

II

En principio, una solicitud en auxilio de jurisdicción es un remedio provisional que "está predicado en la facultad inherente que tiene todo tribunal para estructurar remedios que protejan su jurisdicción y eviten un fracaso de la justicia". <u>Misión Ind. P.R. v. J.P. y A.A.A.</u>, 142 D.P.R. 656, 678 (1997). Se trata, pues, de un "remedio en equidad que goza de características afines a otros de similar naturaleza, como lo son el entredicho provisional y el injunction preliminar". Íd.

Cónsono con lo anterior, en <u>Peña v. Federación de Esgrima de P.R.</u>, 108 D.P.R. 147, 154 (1978), reiterado en <u>Plaza Las Américas, Inc. v. N&H, S.E./Tiendas Sedeco</u>, 166 D.P.R. 631, 642-643 (2005), este Tribunal estableció los cuatro (4) criterios que se deben considerar cuando se solicitan medidas de paralización, bien sean radicadas en el foro primario o en el apelativo. Así, expresamos que

> [l]a solicitud para detener (stay) la ejecución de la sentencia en los casos de injunction, **bien se radique en instancia o en el tribunal de apelación**, va dirigida a su discreción y deberá satisfacer los siguientes requisitos: (a) que el peticionario presente un caso fuerte de probabilidad de prevalecer en los méritos de la apelación; (b) que demuestre que a menos que se detenga la ejecución sufrirá un daño irreparable; (c) que ningún daño substancial se causará a las demás partes interesadas; y (d) que la suspensión de la sentencia no perjudica el interés público. (Énfasis nuestro.) <u>Peña v. Federación de Esgrima de P.R.</u>, supra, pág. 154.

Por su parte, la Regla 57.7 de Procedimiento Civil, 32 L.P.R.A. Ap. V, R.57.7, también atiende lo relativo a las instancias en que una parte recurre de una orden de *injunction*. Así, la referida disposición legal establece lo siguiente:

> (a) Cuando una parte apele o recurra de una orden o sentencia que conceda, deje sin efecto o deniegue un *injunction*, el tribunal de instancia, en el ejercicio de su discreción, podrá suspender, modificar, restituir o conceder un *injunction* mientras se dilucida el recurso interpuesto bajo aquellos términos relativos a fianza y demás que estime adecuados para proteger los derechos de la parte contraria.
>
> (b) **Lo dispuesto en esta regla no restringe la facultad del tribunal de apelación o de uno(a) de sus jueces o juezas para paralizar los procedimientos mientras se dilucida el recurso**

**interpuesto** o para suspender, modificar, restituir o conceder un *injunction* mientras esté pendiente la apelación o *certiorari*, o para dictar cualquier orden adecuada para preservar el *status quo* o la efectividad de la sentencia que habrá de emitirse en su día. No obstante, cuando una parte recurra de una orden que deje sin efecto o deniegue un entredicho provisional, el tribunal de apelación sólo podrá emitir, mientras dilucida el recurso interpuesto, una orden provisional *ex parte* que no debe excederse del término de diez (10) días que caracteriza a dicho recurso extraordinario, salvo que el tribunal expresamente prorrogue dicho término en conformidad con la Regla 57.1. (Énfasis nuestro.)

III

Conforme la normativa jurídica antes esbozada, no cabe duda que el Tribunal de Apelaciones posee la facultad para paralizar los efectos de un entredicho preliminar otorgado por el Tribunal de Primera Instancia mientras considera un recurso de apelación. Ante esta realidad, ¿erró el foro apelativo intermedio en el caso de marras al no atender con celeridad la moción en auxilio de jurisdicción presentada por los peticionarios y al no conceder el remedio allí solicitado? Entendemos que sí. Veamos.

Luego de examinar minuciosamente el expediente de autos y la moción en auxilio de jurisdicción presentada por los peticionarios ante el Tribunal de Apelaciones, colegimos que ésta cumple con todos los requisitos previamente esbozados. Por otro lado, resulta de igual o mayor preocupación que el Tribunal de Primera Instancia, luego de resolver implícitamente que el inciso B-9 del

Art. 5.09 de la Ordenanza Municipal Núm. 7, *supra*, es constitucional de su faz,[2] haya otorgado el interdicto preliminar solicitado por las recurridas **sin que se haya desfilado prueba suficiente en derecho sobre la naturaleza y titularidad del muro en donde MAMPR lleva a cabo sus manifestaciones**. Es decir, de la sentencia parcial recurrida surge que el foro primario no conoce si dicho muro es propiedad privada, propiedad pública perteneciente al Municipio de San Juan bajo la Ley Núm. 81 del 30 de Agosto de 1991, según enmendada, conocida como Ley de Municipios Autónomos, 21 L.P.R.A. §§ 4001 *et seq.*, o si es una pared perteneciente al Gobierno de Puerto Rico. Véase, Apéndice de petición de *certiorari*, págs. 112, 118 y 129.

Más alarmante aún, el foro de instancia razonó que el referido muro constituye un foro público tradicional. Su decisión estuvo basada en la prueba testimonial desfilada, la cual -aunque creída- sólo se limitó a indicar que en dicho muro, "tradicionalmente", se han hecho expresiones de similar naturaleza. Íd., pág. 128. Ello, no implica que el muro constituya automáticamente propiedad pública, como tampoco es fundamento suficiente para razonar *sua sponte* que éste es un foro público tradicional.[3]

---

[2] Al así resolver, resulta innecesario en esta etapa que este Tribunal emprenda un examen estricto sobre la faz y la constitucionalidad del inciso B-9 del Art. 5.09 de la Ordenanza Municipal Núm. 7, *supra*.

[3] Incluso, la prueba testimonial desfilada ante el Tribunal de Primera Instancia reveló que "existen paredes en el Municipio de San Juan que

Ciertamente, en todo sistema democrático el derecho a la libertad de expresión enmarca uno de los valores más preciados para nuestro pueblo y figura entre los de mayor preeminencia en nuestro ordenamiento constitucional. Su importancia, al igual que la de otros derechos fundamentales, está tan arraigada al funcionamiento de dicho sistema que no vacilamos cuando afirmamos que la libertad de expresión es uno de los derechos más preciados que posee el ser humano. Asoc. de Maestros v. Srio. de Educación, 156 D.P.R. 754 (2002); Coss y U.P.R. v. C.E.E., 137 D.P.R. 877 (1995). Sin embargo, este derecho, al igual que los demás derechos fundamentales, no es irrestricto. U.P.R. v. Laborde Torres et als., 2010 T.S.P.R. 225, 180 D.P.R. ___ (2010). Por el contrario, éste cede cuando el Estado pretende otorgarle mayor protección a un interés apremiante o cuando, ante un derecho de igual jerarquía y unas circunstancias particulares, en el balance de intereses y su debida ponderación, se opta por darle mayor protección al otro derecho fundamental.[4]

---

exhiben expresiones, y que por ser **privadas no son intervenidas…**". *Véase*, Apéndice de petición de *certiorari*, pág. 119.

[4] Lasso v. Iglesia Pentecostal La Nueva Jerusalem, 129 D.P.R. 217 (1991); E.L.A. v. Rivera Rivera, 105 D.P.R. 640 (1977); E.L.A. v. Hermandad de Empleados, 104 D.P.R. 436 (1975); Sucn. de Victoria v. Iglesia Pentecostal, 102 D.P.R. 20 (1974); Cervecería Corona v. Srio. de Obras Púbilcas, 97 D.P.R. 44 (1969); Hudgens v. NLRB, 404 U.S. 507 (1976); Lloyd Corp. v. Tanner, 407 U.S. 551 (1972); Breard v. Alexandria, 341 U.S. 622 (1950). *Cf.*, Emp. Pur. Des., Inc. v. H.I.E. Tel., 150 D.P.R. 924 (2000); Pruneyard Shopping Center v. Robins, 447 U.S. 74 (1980).

Sin embargo, en el caso de autos los foros inferiores no le otorgaron la importancia merecida a uno de los principios más básicos del derecho constitucional: **las garantías individuales consagradas en el Artículo II de la Constitución de Puerto Rico sólo son oponibles contra el Estado.**[5] Precisamente, dada la función neurálgica de este principio y sus contadas excepciones, entendemos que previo a resolver cualquier controversia sobre el ejercicio del derecho fundamental a la libertad de expresión en propiedad privada o en un foro público tradicional, por designación o no tradicional, **es imprescindible que se acredite ante el tribunal, con evidencia suficiente en derecho, la naturaleza y titularidad de la propiedad en donde se pretende ejercer tal derecho.**[6] Por ello, debido a que aún existen varias interrogantes sobre la naturaleza y titularidad del muro

---

[5] Este principio medular tiene sus contadas excepciones. Véanse, Emp. Pur. Des., Inc. v. H.I.E.Tel., supra; Lasso v. Iglesia Pent. La Nueva Jerusalem, supra; Arroyo v. Rattan Specialties, 117 D.P.R. 35 (1986); Tel. Co. v. Martínez, 114 D.P.R. 328 (1983); E.L.A. v. Hermandad de Empleados, supra; Sucn. de Victoria v. Iglesia Pentecostal, supra. Véase, además, Pruneyard Shopping Center v. Robbins, supra. *Cf.* Hudgens v. NLRB, supra; Lloyd Corp. v. Tanner, supra.

[6] Resulta de particular importancia resaltar que, por ser axiomático, en ninguno de los casos entendidos por este Tribunal sobre libertad de expresión se cuestionó la naturaleza y titularidad de la propiedad en donde se ejerce tal derecho. Véanse, por ejemplo, UPR v. Laborde Torres y otros, 2010 T.S.P.R. 225, 180 D.P.R. ___ (2010) (no estuvo en controversia la naturaleza pública de la Universidad de Puerto Rico); Emp. Pur. Des., Inc. v. H.I.E.Tel., supra (no estuvo en controversia la naturaleza privada del Mayagüez Mall); Mari Brás v. Alcaide, 100 D.P.R. 506 (1972) (no estuvo en controversia que los carteles o pasquines se fijaban en propiedad pública).

Asimismo, es menester señalar que la naturaleza pública o privada del lugar en donde se ejerce el derecho a la libertad de expresión, luego de ser acreditada, arrojará luz al tribunal sobre el examen que debe emprender para adjudicar cualquier controversia correctamente, a saber: (a) si debe aplicarse un escrutinio estricto, intermedio o racional; o (b) si debe aplicar un balance de intereses.

en donde MAMPR ejerce su derecho a la libre expresión, las cuales deben ser contestadas previo a que se determine si éste constituye un foro público tradicional, por designación o no tradicional, entendemos que el Tribunal de Primera Instancia se precipitó de sobremanera al otorgar el interdicto preliminar solicitado por las recurridas.

En ausencia de este análisis, y dado a que el Tribunal de Primera Instancia resolvió implícitamente que el inciso B-9 del Art. 5.09 de la Ordenanza Municipal Núm. 7, *supra*, es constitucional de su faz sin emprender el examen constitucional correspondiente, resulta forzoso concluir que el foro primario abusó de su discreción.[7] Es decir, el foro primario incidió al adentrarse en un examen constitucional basado en la aplicación de la ordenanza impugnada sin antes ejercer el "análisis juicioso y acucioso"[8] que toda impugnación de su faz conlleva.

Por ello, razonamos que el foro primario erró por las siguientes razones: (1) por no plasmar su estricto raciocinio sobre la faz y constitucionalidad del referido

---

[7] Un tribunal de justicia incurre en abuso de discreción "cuando el juez, en la decisión que emite, no toma en cuenta e ignora, sin fundamento para ello, un hecho material importante que no podía ser pasado por alto; cuando, por el contrario, el juez, sin justificación y fundamento alguno para ello, le concede un gran peso y valor a un hecho irrelevante e inmaterial y basa su decisión exclusivamente en el mismo; o cuando, no obstante considerar y tomar en cuenta todos los hechos materiales e importantes y descartar los irrelevantes, el juez livianamente sopesa y calibra los mismos". Pueblo v. Rivera Santiago, 176 D.P.R. 559, 580 (2009); García v. Asociación, 165 D.P.R. 311, 321-322 (2005); Pueblo v. Ortega Santiago, 125 D.P.R. 203, 211-212 (1990).

[8] Véase, Opinión Disidente, págs. 7-8

inciso; y (2) por otorgarle un valor probatorio irreal a los testimonios vertidos en la vista celebrada y resolver que éste constituye un foro público tradicional sin que se acreditara con prueba suficiente en derecho la naturaleza pública del muro en el cual se llevaron a cabo las manifestaciones. Así, pues, aparte de que la moción presentada ante nos cumple con los requisitos antes esbozados, **éstas son las razones por las cuales este Tribunal ordenó la paralización del interdicto concedido por el foro primario.**

De igual forma, colegimos que el Tribunal de Apelaciones erró al no atender con premura y celeridad la moción en auxilio de jurisdicción que se le presentara. Ante los errores mencionados, y contrario al curso de acción seguido por el foro primario, entendemos que el foro apelativo intermedio debió paralizar inmediatamente los efectos del interdicto concedido. **Sólo así evitamos colocar a MAMPR en una especie de "vacío jurídico" mediante el cual el ejercicio de un derecho fundamental implica la posibilidad de incurrir en conducta delictiva.**[9]

---

[9] Véanse, Artículos 207-209 del Código Penal de Puerto Rico. 33 L.P.R.A. secs. 4835-4837.

**"Artículo 207. Daños.**

Toda persona que destruya, inutilice, altere, desaparezca o de cualquier modo dañe un bien mueble o un bien inmueble ajeno incurrirá en delito menos grave.

El tribunal podrá también imponer la pena de restitución.

**Artículo 208. Daño agravado.**

Incurrirá en delito grave de cuarto grado, toda persona que cometa el delito de daños en el Artículo 207 de este

En otras palabras, el Tribunal de Apelaciones, al concederle diez días a la parte recurrida para que se expresara sobre la moción urgente de los peticionarios, no actuó con la premura exigida por las circunstancias presentadas en el caso de autos. Sin duda, al no existir certeza sobre la naturaleza y titularidad del muro, el proceder del foro apelativo intermedio propició un panorama de incertidumbre en el que el ejercicio de la libertad de expresión de MAMPR podía implicar la comisión de conducta delictiva. De ahí la urgencia con la que este Tribunal ordenó la paralización de los efectos del interdicto concedido por el Tribunal de Primera Instancia, pues el propio bien de MAMPR, en conjunto con nuestro norte de hacer justicia, así lo exigían. **De resolver lo**

---

Código, si concurre cualquiera de las siguientes circunstancias:

(a) con el empleo de sustancias dañinas, ya sean venenosas, corrosivas, inflamables o radioactivas, si el hecho no constituye delito de mayor gravedad;

(b) cuando el daño causado es de mil (1,000) dólares o más;

(c) en bienes de interés histórico, artístico o cultural;

(d) cuando el daño se causa a bienes inmuebles pertenecientes al Estado Libre Asociado de Puerto Rico o a entidades privadas con fines no pecuniarios.

El tribunal podrá imponer también la pena de restitución.

**Artículo 209. Fijación de carteles.**

Toda persona que pegue, fije, imprima o pinte sobre propiedad pública, excepto en postes y columnas, o sobre cualquier propiedad privada sin el consentimiento del dueño, custodio o encargado, cualquier aviso, anuncio, letrero, cartel, grabado, pasquín, cuadro, mote, escrito, dibujo, figura o cualquier otro medio similar, sin importar el asunto, artículo, persona, actividad, tema, concepto o materia a que se hace referencia en los mismos, incurrirá en delito menos grave.

El tribunal podrá imponer también la pena de restitución."

**contrario y resultar que el muro en cuestión constituye propiedad privada y que la MAMPR no ha obtenido el consentimiento del titular para llevar a cabo allí sus manifestaciones, estaríamos avalando una conducta tipificada como delito.**[10]

IV

Finalmente, ante las expresiones contenidas en la Opinión Disidente, entendemos necesario emitir y acentuar algunas palabras.

Hace ya más de dos décadas que este Tribunal resolvió los casos Granados v. Rodríguez Estrada V, 127 D.P.R. 1 (1990); Granados v. Rodríguez Estrada II, 124 D.P.R. 589 (1989); y Granados v. Rodríguez Estrada I, 124 D.P.R. 1 (1989). Aunque el *ratio decidendi* de todos ellos es irrelevante a la correcta solución del caso de marras, resulta importante señalar que en aquellas instancias este Tribunal hizo eco de las notorias palabras del gran jurista y decano Roscoe Pound al momento de resaltar la naturaleza de las opiniones disidentes y el temple que los jueces debemos mantener al redactarlas.[11]

---

[10] Claro está, luego de analizar estrictamente la faz del inciso B-9 del artículo 5.09 de la Ordenanza Municipal Núm. 7, *supra*, y de acreditarse con prueba suficiente en derecho que el muro es propiedad pública, procede entonces que el foro apelativo intermedio evalúe si el referido muro constituye un foro público tradicional, por designación o no tradicional, y si dicho inciso **es inconstitucional en su aplicación.**

[11] Véanse Granados v. Rodríguez Estrada II, 124 D.P.R. 593, 614 (1989), nota 6; Granados v. Rodríguez Estrada I, 124 D.P.R. 1, 73-74 (1989), nota 3. Véase, además, Domínguez Castro y otros v. E.L.A. y otros, 2010 T.S.P.R. 22, págs. 64-65, 178 D.P.R. ___ (2010) (Voto Particular del Juez Asociado señor Rivera Pérez).

En específico, en <u>Granados v. Rodríguez Estrada II</u>, supra, este Tribunal, por voz del hoy Juez Presidente señor Hernández Denton, asumió una posición orientadora ante las expresiones vertidas en la opinión disidente. Así, en la nota al calce número 6 de <u>Granados v. Rodríguez Estrada II</u>, supra, expresamos lo siguiente:

> Escribir una opinión disidente conlleva una responsabilidad. . . . **No hay cabida en las opiniones suscritas por jueces de un tribunal estatal de última instancia para la censura desmesurada, para la extrema vituperación, acusaciones de malsanas motivaciones a la opinión mayoritaria e insinuaciones de incompetencia, negligencia, prejuicio o insensibilidad por parte de los otros jueces del tribunal.** . . . Para justificar una disidente denunciatoria, la cuestión de derecho debe ser de considerable importancia. Para justificar una disidente en que se censura a un colega, si esto es al fin justificable, la cuestión de derecho debe ser excepcionalmente decisiva y los errores señalados de la más seria naturaleza. . . . **[L]a opinión de un juez de última instancia debe expresar sus razones y no sus opiniones particulares.** R. Pound, <u>Cacoethes Dissentiendi: The Heated Judicial Dissent</u>, 39 A.B.A. J. 794, 795 (1953).[12] (Énfasis nuestro.)

Estas expresiones, más que meras palabras, han trascendido a ser la fuente del poder de donde emana la fortaleza de toda voz disidente. El respeto, deferencia y cuidado con el cual se confecciona una opinión disidente nunca debe ceder ante posiciones personales y particulares, como tampoco a ataques a la buena función de este Foro. Es decir, escribir una opinión disidente conlleva un grado mayor de celo y cuidado. No porque

---

[12] Traducido en <u>Granados v. Rodríguez Estrada V</u>, 127 D.P.R. 1, 7 (1990).

mediante ella se presenta una vertiente jurídica distinta a la posición de los demás compañeros jueces, sino porque la voz disidente de todo foro colegiado enriquece a plenitud el jardín del quehacer jurídico.

En armonía con lo anterior, somos del criterio que la voz disidente -en muchas ocasiones- constituye la luz que ilumina el camino y funciona como agente necesario del cambio para las futuras generaciones. Por ello, a través de los años los postulados del gran jurista y decano Roscoe Pound han calado profundo en nuestro ordenamiento legal y deben ser seguidos con vehemencia.

No obstante lo anterior, hoy nos enfrentamos ante una Opinión Disidente que parece desvirtuar la verdadera controversia presentada ante este Tribunal mediante la formulación de interrogantes "ajenas" a la sana solución del caso de autos. Ciertamente, los incidentes fácticos no están en disputa. En puridad, la controversia presentada ante este Tribunal, como indicáramos anteriormente, versa sobre si el Tribunal de Apelaciones erró al no atender con celeridad la moción en auxilio de jurisdicción presentada por los peticionarios y al no conceder el remedio allí solicitado. No más. Ante ello, la mayoría de este Tribunal resuelve en la afirmativa y enuncia los fundamentos jurídicos adecuados para resolver en estricto derecho.

Empero, la opinión disidente formula una serie de interrogantes cuya función parece sugerir que este Tribunal pretende coartar el derecho a la libertad de expresión de MAMPR. Nada más lejos de la verdad. Ante ello, nos vemos precisados a reafirmar con vehemencia que "entre las libertades individuales, la libertad de expresión es probablemente la más esencial, una vez garantizado el derecho a la vida y a la libertad física". Asoc. de Maestros v. Srio. de Educación, 156 D.P.R. 754, 767 (2002). "La libertad de expresión es la quintaesencia de una sociedad democrática. De forma multidimensional, en la constelación de valores democráticos, goza de una primacía peculiar". Coss y U.P.R. v. C.E.E., 137 D.P.R. 877, 886 (1995). Como resultado, este Tribunal está llamado a la más celosa protección de tal derecho cardinal. Asoc. de Maestros v. Srio. de Educación, supra, pág. 768.

Ante la importancia que reviste el ejercicio de la libertad de expresión, no para un grupo en particular, sino para toda la sociedad hacemos eco de las siguientes expresiones:

> Nuestra Ley Suprema proclama con palmaria claridad que "el sistema democrático es fundamental para la vida de la comunidad puertorriqueña". Como derivación lógica de tal sistema democrático, resulta forzosa la existencia de una Constitución. En ella, todo funcionario público -incluyendo el Juez- encuentra su fuente de poder -al igual que los límites a éste-, *y se garantizan las libertades fundamentales del ciudadano*, incluso las

indemnidades de aquellos que se encuentran en la minoría. Íd.

Es a la luz de esta realidad social que esta Curia ha articulado que

> [s]e incluyen en la constitución de un país aquellos principios jurídicos a los cuales desea imprimírseles estabilidad. *Se trata de aquellas normas sociales que se consideran vitales para la convivencia pacífica, el bien común y la continuidad de una democracia saludable.* En suma, son reglas de carácter tan esencial para una sociedad, que su permanencia no se abandona a los vaivenes de gobierno o a meros cambios de idiosincrasia. (Énfasis nuestro). Colón Cortés v. Pesquera, 150 D.P.R. 724, 766 (2000).

Sin lugar a dudas, la garantía cardinal de la libertad de expresión consagrada en nuestra Carta de Derechos integra esa lista de principios jurídicos a los cuales los padres de nuestra Constitución quisieron imprimirles estabilidad por considerarlos de importancia vital para nuestra vida democrática. (Citas omitidas.)[13]

En consideración a ello, puntualizamos que la resolución de la controversia ante nos responde estrictamente a los principios que rigen el análisis constitucional y no a "una novedosa teoría sobre los derechos a la libertad de expresión" como afirma la disidencia. Véase, Opinión Disidente, pág. 5.

Así pues, **el resultado alcanzado por este Tribunal en esta ocasión habría sido el mismo independientemente de la entidad involucrada y del contenido de las expresiones manifestadas, pues ello resulta ser irrelevante para alcanzar la más sana solución del presente recurso.**

---

[13] U.P.R. v. Laborde, 2010 T.S.P.R. 234, págs. 2-3 180 D.P.R. ___ (2010) (Voto Particular del Juez Asociado señor Rivera García).

V

Por los fundamentos expuestos, declaramos Ha Lugar el recurso de *certiorari* presentado por los peticionarios. En consecuencia, se mantienen paralizados los efectos del interdicto preliminar otorgado por el Tribunal de Primera Instancia. Devolvemos el expediente de autos al Tribunal de Apelaciones para que atienda con premura y resuelva en los méritos el recurso de apelación presentado por el Municipio de San Juan.

Se dictará sentencia de conformidad.


                              Edgardo Rivera García
                              Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Josefina Pantoja Oquendo,
*et als.*
Recurridos

v.          CC-2010-0805

Municipio de San Juan,
Policía Municipal de San
Juan, Hilton Cordero
Peticionarios

Certiorari

SENTENCIA

San Juan, Puerto Rico, a 9 de junio de 2011.

Por los fundamentos expuestos en la Opinión que antecede, la cual se hace formar parte íntegra de la presente, declaramos Ha Lugar el recurso de *certiorari* presentado por los peticionarios. En consecuencia, se mantienen paralizados los efectos del interdicto preliminar otorgado por el Tribunal de Primera Instancia. Devolvemos el expediente de autos al Tribunal de Apelaciones para que atienda con premura y resuelva en los méritos el recurso de apelación presentado por el Municipio de San Juan.

Así lo pronunció y manda el Tribunal y certifica la Secretaria del Tribunal Supremo. La Juez Asociada señora Rodríguez Rodríguez emitió una Opinión Disidente a la cual se unieron el Juez Presidente señor Hernández Denton, la Jueza Asociada señora Fiol Matta y el Juez Asociado señor Estrella Martínez.

Aida Ileana Oquendo Graulau
Secretaria del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Josefina Pantoja Oquendo, Leila G. Negrón Cintrón, Sara Benítez Cintrón, Nitza I. Meléndez Nieves

     Recurridas

          v.

Municipio de San Juan, Policía Municipal, Hilton Cordero

     Peticionarios

CC-2010-805

Opinión disidente emitida por la Juez Asociada señora Rodríguez Rodríguez a la que se une el Juez Presidente señor Hernández Denton, la Jueza Asociada señora Fiol Matta y el Juez Asociado señor Estrella Martínez

San Juan, Puerto Rico, a 9 de junio de 2011

    Disiento del criterio mayoritario por considerar que en esta etapa procesal es innecesario acreditar la naturaleza pública y privada del lugar donde se ejerce el derecho a la libertad de expresión, como paso previo a la concesión de un interdicto preliminar. Igualmente considero que el Tribunal de Apelaciones actuó razonablemente y ejerció adecuada discreción al acotar los términos en este caso.

    Veamos someramente la controversia que nos ocupa.

I

Hace aproximadamente un año, el 3 de julio de 2010 en horas de la mañana, un grupo de integrantes del Movimiento Amplio de Mujeres de Puerto Rico se encontraba pintando un mural en un muro o pared de contención que colinda por la parte de atrás con el Colegio San José de Rio Piedras -- Carretera Interestatal Número 3, Avenida 65 de Infantería frente a la Barriada Buen Consejo-- cuando fueron multadas por la Policía Municipal de San Juan, al no contar con un permiso del Municipio para llevar a cabo esa actividad. El mural que pintaban leía: "Tod@s contra la Violencia Machista", y era parte de una campaña de educación sobre el alarmante problema de violencia doméstica que aqueja al país. Éste era el segundo mural que pintaba este grupo pues meses antes habían pintado otro en el Expreso de Trujillo Alto.

Mientras este grupo de activistas pintaba, efectivos de la Policía Municipal de San Juan junto al entonces Comisionado de la Policía Municipal, el Sr. Hilton Cordero, se presentaron al área y, alegando que la actividad que llevaban a cabo estaba prohibida por la Ordenanza Municipal 44 serie 2005-2006, expidieron multas administrativas por la cantidad de $1,000 a cada una de las personas que allí pintaban. Se les confiscó también los materiales que llevaban consigo para pintar el mural. Funcionarios del Municipio borraron más tarde el mural pintado.[14]

---

[14] Esta sucinta relación de hechos se basa en los hechos estipulados por las partes y en la transcripción de vista de *injuction* preliminar, celebrada los días 10 y 11 de agosto.

Posteriormente, el grupo de mujeres multadas presentó la demanda de epígrafe sobre entredicho provisional, injunction preliminar y permanente y sentencia declaratoria. En ésta solicitaron que se le prohibiera a los demandados intervenir con la actividad que llevaban a cabo pues, se alegó, ello era violatorio de su derecho a la libertad de expresión. Se solicitó que se declararan nulas las multas administrativas impuestas, y que se declarara inconstitucional --de su faz o en su aplicación-- la Ordenanza Municipal Núm. 7, Serie 2002-2003. El 10 y 11 de agosto de 2010 se celebró la vista evidenciaria para atender los reclamos de la parte demandante. Luego, el Tribunal de Primera Instancia dictó una sentencia y expidió un interdicto preliminar que le prohibía a los demandados intervenir con las demandantes mientras pintaban murales en lugares denominados foros púbicos tradicionales o por designación, tales como el muro de contención donde fueron intervenidas originalmente por la Policía Municipal de San Juan. El Tribunal remitió las restantes controversias relacionadas con la sentencia declaratoria solicitada y el *injunction* permanente a la sala de lo civil contencioso para que continuaran allí los procedimientos.

Insatisfecho, los demandados presentaron un recurso de apelación ante el Tribunal de Apelaciones. El recurso presentado se acompañó con una moción en auxilio de jurisdicción solicitando se dejara sin efecto el interdicto preliminar expedido. **Ese mismo día**, el foro apelativo intermedio emitió una Resolución en la que le concedió a la

parte demandante "un término de 10 días . . . para que se expresa[ran] sobre" la apelación presentada así como la moción en auxilio de jurisdicción presentada por el Municipio de San Juan.

Inconforme con la orden emitida, el Municipio de San Juan presentó una petición de *certiorari* ante este Tribunal cuestionando el término de 10 días concedidos. Se acompañó el recurso presentado con una moción en auxilio de jurisdicción en la cual se reprodujeron los argumentos presentados ante el foro intermedio. Sorprendentemente, este Tribunal expidió el auto solicitado y hoy deja sin efecto el interdicto preliminar expedido por el foro de instancia.

Visto lo anterior, la controversia que pende ante nuestra consideración es si constituyó un abuso de discreción del Tribunal de Apelaciones conceder el breve término de diez días a los demandantes para que se expresaran en torno a la moción en auxilio de jurisdicción como el recurso de apelación presentado. De eso trata este caso; de nada más. Este Tribunal, al "resolver" esta controversia resuelve el caso en sus méritos haciendo caso omiso del testimonio vertido en sala y adoptando una novedosa teoría sobre el derecho a la libertad de expresión.

II

Considero innecesaria la intervención nuestra en esta etapa de los procedimientos. Adviértase que el interdicto preliminar se expidió por el foro de instancia como medida cautelar para proteger un reclamo de libertad de expresión. Lo razonable en estos casos, donde se solicita que en auxilio

de la jurisdicción del tribunal se deje sin efecto una orden de interdicto, es actuar precisamente como actuó el foro apelativo intermedio; brindándole una oportunidad a la parte que reclama que se le ha conculcado su derecho a la libertad de expresión y que ha recibido protección de parte del foro de instancia para expresarse en torno al reclamo de la otra parte. El foro apelativo fue en extremo diligente en este caso. **El mismo día en que se presentó la moción en auxilio de jurisdicción y el escrito de apelación, acortó los términos y concedió 10 días a las demandantes para que se expresaran.** Concluir, como hace el Tribunal de que el Tribunal de Apelaciones abusó de su discreción "al no atender con celeridad la moción en auxilio de jurisdicción presentada", sorprende y consterna pues no refleja la realidad. Por otro lado, debemos preguntarnos: ¿En qué reside el abuso de discreción si la moción se atendió el mismo día que se presentó y se acortaron los términos? ¿En qué consiste el grave daño sufrido por los demandados que exigiría paralizar los efectos del interdicto preliminar expedido sin escuchar a la parte beneficiada por éste? ¿Qué peligra? El Tribunal, a mi juicio, no ofrece una respuesta satisfactoria.

El Municipio por su lado alega, tal y como recoge la sentencia dictada, que lo que se afectaría sería "su legítimo interés en mantener la estética y el ornato del municipio". ¿Es verdaderamente este interés uno de tal envergadura como para enfrentarse exitosamente al derecho constitucional a la libertad de expresión? Este Tribunal parece entender que sí.

Observamos además que los demandados, al acudir en alzada no acompañaron su petición con una transcripción de la vista del *injuction* preliminar, por lo tanto, lo único que tenía ante sí el foro intermedio eran las alegaciones de las partes. ¿No era más juicioso esperar que la otra parte se expresara sobre la solicitud de los demandados antes de dejar sin efecto el entredicho provisional emitido, ante la ausencia de una transcripción de la vista de *injunction* preliminar? ¿No sería mejor escuchar a ambas partes? ¿No está este Tribunal interviniendo con las determinaciones discrecionales del foro de apelación sobre cómo manejar los asuntos relacionados a la tramitación de los casos ante su consideración? No podemos reclamar deferencia para con las decisiones del Tribunal de Apelaciones en unos casos y en otros no. Conviene recalcar que el foro intermedio **no denegó la solicitud de auxilio de jurisdicción, simplemente optó por escuchar a la otra parte.** ¿Por qué no dejar que el Movimiento Amplio de Mujeres de Puerto Rico se exprese? ¿Por qué no **al menos** en el tribunal?

Tal parece que el Tribunal no comprende el alcance de la protección que el derecho a la libre expresión le reconoce a aquella expresión que se refiere a asuntos de interés público, que es el que nos ocupa en esta ocasión. "[S]peech on public issues occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection." *Connick v. Myers*, 461 US 138, 145 (1983). La expresión ciudadana sobre asuntos de relieve público es de la esencia del derecho a la libertad de expresión. *First Nat.*

*Bank of Boston v. Belloti*, 435 US 765, 776 (1978). Véase también, *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.,* 472 U.S. 749, 758-759 (1985)("[S]peech on 'matters of public concern'… is 'at the heart of the First Amendment's protection.") La libertad de expresión refleja nuestro compromiso como país de que la discusión de los asuntos de alto interés público, debe ser robusta, desinhibida y abierta. *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964). Sólo así garantizamos que la nuestra, sea una sociedad libre y democrática. Sin crítica no puede haber libertad. Recientemente, el Tribunal Supremo de Estados Unidos ratificó este valor. En *Snyder v. Phelps*, 562 U.S. ___ (2011) el Tribunal se expresó sobre la importancia de no sofocar la expresión ciudadana, incluyendo la crítica hiriente y ofensiva, indicando: **"Speech is powerful. … As a Nation we have chosen a different course —to protect even hurtful speech on public issues to ensure that we do not stifle public debate."** (Énfasis nuestro.)

El hecho que haya otros lugares donde expresarse no valida una actuación contraria al derecho de los miembros del Movimiento Amplio de Mujeres a expresarse en el foro público que escojan. Por otro lado, el Tribunal parece no tomar en cuenta que reglamentaciones como la impugnada en este caso por las demandantes se consideran ejemplos clásicos de censura previa que requieren, necesariamente, un análisis juicioso y acucioso. Véase en términos generales, Erwin Chemerinsky, *Constitutional Law Principles and Policies,* Aspen Publishers, 3ra ed., New York, 2006, sec. 11.2.3.4.

Parecería, que la razón fundamental para que este Tribunal revoque el dictamen del foro de instancia y deje sin efecto el interdicto preliminar dictado es que, a su juicio, no se demostró la titularidad del muro donde se pintaba. Específicamente, el Tribunal asevera que se "otorg[ó] el interdicto preliminar solicitado por las recurridas **sin que se haya desfilado prueba sobre la naturaleza y titularidad del muro** … Es decir, de la sentencia parcial recurrida surge **claramente** que el foro primario no conoce si dicho muro es propiedad privada, constituye propiedad pública perteneciente al Municipio de San Juan … o si es una pared perteneciente al gobierno central de Puerto Rico." (Énfasis en original.)

Del testimonio vertido en sala por el entonces Comisionado de Seguridad, Sr. Hilton Cordero surgió el siguiente diálogo durante el proceso de interrogatorio:

P.    ¿Qué instrucciones usted le ha dado a sus subalternos para intervenir cuando se está pintando unos murales de esta índole?

R.    De, cuando se está pintando *graffiti*, todos los policías tiene instrucciones de intervenir e indagar si la actividad o lo que se está pintando tiene permisos o no tiene permisos.

P.    Okay, ¿Y cuando se está pintando un mural que no es *graffiti*?

R.    ¿Y quien dice que eso no es graffiti?

P.    Ah, yo le pregunto.  Eso es un gra…

R.    Yo dije horita graffiti, ¿no?, yo dije...

P.    ¿Perdon?

R.    bueno, yo me percaté que había un *graffiti* en la pared, porque es *graffiti*.

P.    Okay.  ¿Para usted esto es un *graffiti*?

R.  Sí.

P.   Okay, bien.   Entonces, ¿sí hay instrucciones intervenir y pedir el permiso?

R.  Seguro.

P.  Si se tiene el seguro, se permite?

R.  **Si se tiene el permiso, obviamente, ya tiene el permiso y se continúa y …**

P.  **Bien.  ¿En la pared municipal que sea?**

R.   **En la pared del municipio que sea; no, no municipal necesariamente, porque hay otras paredes donde se regula esto, que no, no necesariamente son municipales.**

P.   **Okay.   O sea, ¿Que (sic) puede ser una pared municipal, estatal o privada, donde se esté levantando un *graffiti* o un mural como éste y, si tiene permiso, se permite?**

R.  **Si tiene permiso, se permite.  Seguro.**

P.   **No tiene que haber una designación especial de esa pared, sino que cualquier pared uno la puede solicitar para que se pueda utilizar para pintar?**

R.   **Bueno, lo que pasa es que si la pared donde se va a pintar es una que ha sido designada, o por designación o por tradición una pared de expresión, pues entonces no hay que tener permiso.**
P.  Bien.

R.  ¿Verdad?

P.   **Okay.   ¿No hay que tener permiso si por tradición o por designación se hace de esa manera?**

R.  **Correcto.**

P.    **Todas las demás paredes que no sean por tradición o designación, se va a permitir si consigue el permiso?**

R.  **Correcto.  Esa es básicamente la norma.**

Transcripción de vista evidenciaria, 11 de agosto de 2010, págs. 252-254.

De lo anterior se desprende que, independientemente de la titularidad de la propiedad de que se trate, la Ordenanza Municipal 44 requiere que se solicite un permiso del Municipio para colocar cualquier propaganda en tal propiedad. En otras palabras, poco importa quién es el dueño del lugar donde se intenta colocar cierta publicidad, anuncios o mensajes, el Municipio exige que se cumpla con lo dispuesto en la Ordenanza y autoriza la intervención de su Policía Municipal si no se obtiene el permiso correspondiente. Por lo que la conclusión del Tribunal de que había que determinar a quién pertenecía el muro en cuestión para determinar si se expedía o no la orden de interdicto es, a fin de cuentas, irrelevante. Así lo sostuvo el propio abogado del Municipio de San Juan ante el tribunal de instancia:

LCDO. ELIEZER ALDARONDO ORTIZ:

Vuestro Honor, hemos dicho aquí ya como en tres ocasiones distintas, ¿verdad?, pero vamos a repetirlo otra vez más.

La sección... el Artículo 5.09 de la Ordenanza 44, nos pide que se pinte o coloquen avisos, rótulos, anuncios, letreros, carteles, grabados, pasquines, cuadros, escritos o dibujos que incluyan -graffiti, tanto en propiedad pública como en propiedad privada.

Si el titular es el Municipio o es Obras Públicas, no es aquí relevante. Lo que se prohíbe es que se lleve a cabo cualquiera de esas actividades, sean propiedad pública o privada y lo que se proscribe es que sea sin la debida autorización del Departamento de Obras Públicas.

Eso es lo que está prohibido.

**Si es del Municipio o es de Obras Públicas, no tiene relevancia.**

Transcripción de Evidencia, 11 de agosto de 2011, pág. 35. Véase, en igual sentido, Transcripción de Evidencia, 10 de agosto de 2011, págs. 56, 57, 63, 105.

Pero más grave aún, este Tribunal omite testimonio vertido por el Sr. Jorge Santiago Martínez, Asistente de Relaciones con la Comunidad, quien es el empleado municipal que tiene a cargo las brigadas de trabajo que mantiene "limpia [y] bonita" la ciudad. Entre los trabajos que estas brigadas desempeñan se encuentra el "recogido de desperdicios domésticos; de reciclaje; de escombros; limpieza de *graffiti;* de cualquier garabato y cosas que estén en los puentes y en los sitios…." Transcripción de Evidencia, pág. 288. El señor Santiago Martínez testificó que el muro de contención donde escribían las demandantes era propiedad del Municipio. Transcripción de Evidencia, 11 de agosto de 2011, págs. 288-289.

Independientemente de lo anterior, nótese que la acción presentada por las recurridas ante el Tribunal de Primera Instancia involucraba el ataque constitucional a una ordenanza municipal **de su faz**. Por lo tanto, al evaluar si hubo una acción del Estado que haya infringido las protecciones fundamentales que garantiza nuestra Carta Magna, no tenemos que auscultar la titularidad de un mural. El análisis correcto debe enfocarse en el factor que alegadamente coarta los derechos constitucionales de las recurridas. En el presente caso, dicho factor es la ordenanza municipal impugnada y no el muro. La ordenanza, por su parte, claramente constituye una acción del Estado.

Por otro lado, el ex Comisionado de la Policía, Hilton Cordero, testificó también que a través de los últimos 10 años él ha visto en esa pared murales con mensajes de carácter político, mensajes comerciales así como expresiones sobre asuntos públicos.  Específicamente testificó:

P.   Oiga, ¿y en esos últimos diez años, usted recuerda haber visto ahí el mural de "Paz para Vieques" o de la lucha del pueblo viequense en ese lugar, como uno de esos murales?

R.  **Pues, sí, recuerdo haberlo visto**.

P.  Recuerdo haberlo visto.

R.  **Sí**.

P.   Y, además, ¿ha visto propaganda política allí, también, en esos últimos diez años?

R.  **Sí, he visto también**.

P.   ¿Y, además, ha visto propaganda comercial?

R.  **También he visto propaganda comercial**.

(Énfasis nuestro.)  Transcripción de evidencia, 11 de agosto de 2011, págs. 270-271.

Con lo cual, la aseveración del Tribunal de que "el foro de instancia razonó **sin fundamento en derecho alguno** que el muro en controversia constituye un foro público tradicional", no es correcta.  Hay testimonio en el expediente de este caso, específicamente el testimonio del propio Comisionado de la Policía Municipal de San Juan que creído, permite concluir como hizo el foro de instancia, de que el muro en cuestión puede considerarse como un foro público de expresión por la utilización que históricamente se le ha dado a ese lugar, convirtiéndolo para todos los efectos en un foro público por designación, si se considera que no es uno tradicional.

Lo cierto es que cualquier puertorriqueño que haya transitado por la Avenida 65 de Infantería a la altura del Colegio San José, ha observado mensajes alusivos a asuntos de alto interés público como por ejemplo Vieques, así como propaganda política como comercial. No debe sorprender entonces la conclusión del Tribunal de Primera Instancia de que ese lugar es tradicionalmente un foro de expresión pública.

Por los fundamentos que he discutido, disiento del criterio mayoritario.


                              Anabelle Rodríguez Rodríguez
                                   Juez Asociada