Voto particular disidente emitido por la
Jueza Asociada Se-ñora Pabón Charneco,
al cual se unen los Jueces Asocia-dos Señor Rivera García y Señor Feliberti Cintrón.
Diñero del proceder de una mayoría de miembros de este Tribunal que decide denegar las mociones en auxilio de jurisdicción y los recursos de certiorari presentados en *746 los casos de autos. Esta decisión tiene el efecto de mante-ner vigente un injunction permanente contra una parte in-volucrada en un pleito de alto interés público.
A su vez, hoy una mayoría del Tribunal permite que una parte que posee un permiso de construcción de las agencias pertinentes, que no ha sido invalidado por el ente con ju-risdicción exclusiva para ello, quede impedida permanente-mente de continuar construyendo unas instalaciones en las cuales se han invertido millones de dólares. En el camino, se trastoca la confianza en nuestras instituciones y en nuestro ordenamiento jurídico, el cual debe aspirar a ga-rantizar un ambiente de uniformidad y consistencia en la aplicación del Derecho.
Lamentablemente, para llegar a esta conclusión, una mayoría del Tribunal trastoca nuestra normativa en cuanto a legitimación activa en procedimientos administrativos. Peor aún, en uno de los votos emitidos hoy se utilizan facto-res exógenos al Derecho y escenarios que no surgen de los autos —que involucran simios fugitivos rondando por la Isla destruyendo cosechas agrícolas— para llegar a su conclusión. Por las razones que discuto a continuación, me veo en la obligación de disentir respetuosamente de la deci-sión que toma hoy el Tribunal.
I
El origen de los casos de autos se remonta al 2006, cuando el Gobierno de Puerto Rico comenzó una campaña para promocionar la Isla como un Centro de Desarrollo de la Economía del Conocimiento. En esencia, se diseñó un plan para incentivar la inversión en Puerto Rico de compa-ñías especializadas en el campo de la biotecnología. Entre las entidades interesadas en invertir en Puerto Rico se en-contraba la compañía Bioculture Mauritius Ltd. (en ade-lante B.M.). Esta entidad se dedica a la crianza de primates de la especie macaco cangrejero (macaca fascicularis), *747 los cuales son utilizados por diversas empresas para estu-dios científicos. Atraída por la campaña del Gobierno de Puerto Rico, en febrero de 2008, B.M. organizó la corpora-ción subsidiaria Bioculture Puerto Rico, Inc. (en adelante Bioculture) para dirigir y coordinar su inversión en la Isla.
Así las cosas, luego de gestiones realizadas por Biocul-ture, la entonces Administración de Reglamentos y Permi-sos (en adelante A.R.Pe.(1) expidió en diciembre de 2008 un permiso de construcción para un centro de operaciones de primates en el municipio de Guayama. Este centro co-menzó a construirse en febrero de 2009.
Para esa misma fecha, un grupo de vecinos del municipio de Guayama, dirigidos por Roberto Brito Díaz y varias or-ganizaciones tales como People for the Ethical Treatment of Animals (en adelante P.E.T.A.), presentaron una Querella ante A.R.Pe. en la cual cuestionaron el otorgamiento del permiso de construcción. A.R.Pe. ordenó la paralización del proyecto al identificar algunas deficiencias en el trámite de otorgación del permiso original. Luego de corregir las defi-ciencias y gestionar un nuevo permiso, A.R.Pe. lo otorgó en jimio de 2009. Inconformes, el grupo de vecinos apeló la otorgación del permiso ante la entonces Junta de Apelacio-nes sobre Construcciones y Lotificaciones (en adelante J.A.C.L.). Esta apelación aún está pendiente ante la agencia.
Aún inconformes, y sin haber concluido los trámites ad-ministrativos a nivel apelativo, los vecinos (en adelante re-curridos) presentaron una Demanda ante el Tribunal de Primera Instancia al amparo del Art. 28 de la Ley Núm. 76 de 24 de junio 1975, según enmendada, conocida como Ley Orgánica de la Administración de Reglamentos y Permi-sos, 23 L.P.R.A. sec. 72. Luego de realizar vistas evidencia-rías durante los meses de noviembre y diciembre de 2009 y *748 concluir que los recurridos poseían legitimación activa para entablar el pleito, el foro de instancia ordenó la para-lización permanente de la construcción de Bioculture. En síntesis, el Tribunal de Primera Instancia sostuvo que el uso que se le daría a las facilidades en construcción no era compatible con la clasificación de los terrenos del área, por lo cual procedía la paralización del proyecto.
Insatisfechos, en enero de 2010, Bioculture y el Gobierno de Puerto Rico recurrieron al Tribunal de Apelaciones. A solicitud de los peticionarios, el foro apelativo intermedio dejó sin efecto la Orden de Paralización que dictó el Tribunal de Primera Instancia mientras atendía la Apelación presentada. Luego de tener esta Apelación ante su conside-ración por casi dos (2) años, el Tribunal de Apelaciones emi-tió una Sentencia el 30 de septiembre de este año en la cual confirmó el dictamen del foro de instancia(2) En síntesis, el foro apelativo intermedio concluyó que la evidencia presen-tada por los recurridos satisfizo el requisito de legitimación activa del Art. 28 de la Ley Núm. 76, supra, y que la regla-mentación aplicable no permitía la construcción de las ins-talaciones de Bioculture para el uso propuesto.
A posteriori, el 17 de noviembre de 2011, Bioculture y el Gobierno de Puerto Rico recurrieron ante este Foro me-diante dos (2) recursos de certiorari. A la misma vez, pre-sentaron dos (2) mociones en auxilio de jurisdicción en las cuales solicitaron que dejáramos sin efecto la Orden de Pa-ralización Permanente emitida por el Tribunal de Primera Instancia.
*749 II
Los peticionarios sostienen que los recurridos del caso de autos carecen de legitimación activa para entablar el pleito. Como sabemos, los tribunales en Puerto Rico solo pueden ejercer su función judicial ante casos y controversias. E.L.A. v. Aguayo, 80 D.P.R. 552 (1958). Uno de los requisitos para que exista un caso justiciable es que las partes que solicitan acceso al foro judicial, ya sea en casos civiles o en procedimientos administrativos, ostenten legitimación activa. Fund. Surfrider y otros v. A.R.Pe., 178 D.P.R. 563 (2010); Crespo v. Cintrón, 159 D.P.R. 290 (2003); Col. Peritos Elec. v. A.E.E., 150 D.P.R. 327 (2000); Salas Soler v. Srio. de Agricultura, 102 D.P.R. 716 (1974). Este requisito asegura a los tribunales que los promoventes de un pleito en particular tienen un genuino interés en resolver la controversia, por lo cual defenderán sus posturas vigorosamente y traerán ante la consideración de los tribu-nales todos los asuntos pertinentes. Crespo v. Cintrón, supra, pág. 299.
Como norma general, una parte posee legitimación ac-tiva si cumple cuatro requisitos, a saber, que: “(1) ha su-frido un daño claro y palpable; (2) el referido daño es real, inmediato y preciso, y no abstracto o hipotético; (3) existe conexión entre el daño sufrido y la causa de acción ejerci-tada, y (4) la causa de acción surge bajo el palio de la Cons-titución o de una ley.” (Enfasis suplido.) Col. Peritos Elec. v. A.E.E., supra, pág. 331.
Recientemente nos expresamos en cuanto al significado del requisito de legitimación activa en procedimientos administrativos. En Fund. Surfrider y otros v. A.R.Pe., supra, establecimos que una parte posee legitimación activa para presentar un recurso de revisión judicial al amparo de la Ley Núm. 170 de 12 de agosto de 1988, según enmen-dada, conocida como Ley de Procedimiento Administrativo Uniforme del Estado Libre Asociado de Puerto Rico, 3 L.P.R.A. sec. 2101 et seq., si (1) es parte del proceso y (2) *750 fue adversamente afectada por la decisión de tura agencia administrativa. Fund. Surfrider y otros v. A.R.Pe., supra, págs. 575-576. A su vez, concluimos que una parte adver-samente afectada es aquella que “tiene un interés sustan-cial en la controversia porque sufre o sufrirá una lesión o daño particular que es causado por la acción administra-tiva que se impugna mediante el recurso de revisión judicial. El daño tiene que ser claro, específico y no puede ser abstracto, hipotético o especulativo”. (Enfasis suplido.) íd., pág. 579.
A pesar de que en Fund. Surfrider y otros v. A.R.Pe., supra, analizamos el requisito de legitimación activa en procedimientos administrativos, los fundamentos que allí discutimos son de igual aplicación a casos civiles ordinarios. A su vez, y a diferencia de lo que concluye el Juez Asociado Señor Estrella Martínez en su voto de con-formidad, la normativa de Fund. Surfrider y otros v. A.R.Pe., supra, aplica al derogado Art. 28 de la Ley Núm. 76, supra. El texto del artículo establecía que tendrían de-recho a solicitar la acción estatuida “los colindantes y veci-nos que pudieren ser afectados” por la alegada violación a los reglamentos de A.R.Pe. (Énfasis suplido.) 23 L.P.R.A. sec. 72(c). Al utilizar ese lenguaje, el propio texto del dero-gado artículo establecía que los colindantes y vecinos ten-drían que demostrar que, de alguna forma, habían sido o podían ser afectados por la construcción que impugnan.
El lenguaje del Art. 28 de la Ley Núm. 76, supra, es similar al de la Sec. 4.2 de la Ley Núm. 170, supra, 3 L.P.R.A. sec. 2172, que fue objeto de interpretación en Fund. Surfrider y otros v. A.R.Pe., supra. Esa sección esta-blece que solo podrá solicitar revisión de una orden o reso-lución final de una agencia aquella parte que sea adversa-mente afectada por esta. 3 L.P.R.A. sec. 2172. Ciertamente, no se requiere que los vecinos o colindantes que compare-cen al tribunal al amparo del Art. 28 demuestren un daño de naturaleza irreparable. Sin embargo, están obligados a demostrar que fueron o serán afectados por la construcción
*751 que impugnan. A.R.Pe. v. Rivera, 159 D.P.R. 429, 443 (2003); A.R.Pe. v. Rodriguez, 127 D.P.R. 793, 808 (1991). Por ende, los vecinos y colindantes deben cumplir con los requisitos de legitimación activa esbozados en nuestra ju-risprudencia, incluso lo decidido en Fund. Surfrider y otros v. A.R.Pe., supra. Como muy bien señala el compañero Juez Asociado Señor Martínez Torres en su voto de confor-midad, resolver lo contrario convertiría al Art. 28 en un amuleto mágico que permitiría a una sola persona obviar los requisitos de legitimación activa y paralizar permanen-temente la construcción de proyectos.
En el caso de autos, existe un serio cuestionamiento en cuanto a si los vecinos-recurridos poseen legitimación ac-tiva para sostener un pleito al amparo del Art. 28 de la Ley Núm. 76, supra. Surge de los recursos que varios de los recurridos alegaron ser “vecinos” del área de Guayama, pero no se establece si sufrieron daños concretos debido a la construcción de las instalaciones de Bioculture. A con-trario sensu, las alegaciones de la Demanda presentan da-ños generalizados o especulativos, como por ejemplo, “la ansiedad, la angustia, que provoca el conocer que estos animales al arrebatarlos de su ambiente y al mantenerlos en cautiverio estarán sufriendo daños emocionales severos”. Apéndice del Certiorari CC-2011-931, págs. 126-127.
Por otra parte, surge de los autos que durante las vistas evidenciarías de noviembre y diciembre de 2009 ante el Tribunal de Primera Instancia, los recurridos se limitaron a testificar su nombre y dirección, sin detallar cuáles daños sufrirían a causa de la construcción de Bioculture. A la organización P.E.T.A., por su parte, se le reconoció legiti-mación activa porque uno de los recurridos alegó, sin más, ser miembro de esta. Ello es contrario a nuestra normativa en la cual hemos establecido que una organización puede demandar a nombre de sus miembros, pero que “tienen la obligación de alegar que los daños sufridos por uno o más de los socios dan lugar a una causa de acción justiciable *752 que cualquiera de ellos podría incoar en los tribunales”. (Énfasis suplido.) Col. Ópticos de P.R. v. Vani Visual Center, 124 D.P.R. 559, 565 (1989).
A pesar de estos cuestionamientos, algunos miembros de este Tribunal quedan convencidos que por lo menos uno de los recurridos del caso de autos posee legitimación ac-tiva para llevar el pleito. Se trata de un colindante, quien alegó en la vista evidenciaría de 9 de noviembre de 2009 que había sufrido daños económicos a causa de la construc-ción de Bioculture y que sufrirá otros tipos de daños una vez la compañía comience sus operaciones. En específico, se deduce de la transcripción de la vista que el colindante testificó lo siguiente:
P ... ¿Po[r q]ué más usted demandó? Concretamente qu[é] daño le causó a usted la construcción que lleva a cabo ....
R Me causa el daño, que cuando usted me dijo primero, yo desarrollé un proyecto allí ....
PAjá.
R A la cual ya le pus [e] agua ....
P Unjú.
R Luz, carretera, y tenía tres compradoras] de par de esos solares y cuando escucharon de la cosa esta de los monos, des-pués se me arrepintieron. Y los tengo allí, mire\j] muertos de la risa.
P Okey. O sea, la razón por cual usted radicó este pleito es porque según usted, usted no pudo vender un desarrollo de vivienda urbano, [¿]esa es su razón[?].
R Sí y por la agricultura que yo tenía unos planes ahora para continuar con el resto de la finca con una hacienda que quería hacer y eso pues me ha aguantado, licenciado.
P No, pero expl[í] queme entonces c[ó]mo el proyecto de Bio-culture concretamente afecta su actividad agrícola.
R Entiendo por es [o] de los animales, de los monos de esos, como quiera yo he oído tantos rumores de lo que está ocu-rriendo por allá en Lajas y esos sitios pues, entiendo que eso me va a afectar a mis siembras también.
P Esc[ú]cheme la pregunta, ¿verdad que allí no hay monos al día de hoy?
R No.
P Allí se construye[n] unos edificios.
R Exacto.
*753 P ¿La construcción de esos edificios, de qué manera le afecta a usted en su desarrollo urbano o actividad agrícola?
LCDO. MELENDEZ ZAYAS: Preguntada contestada.
HONORABLE JUEZ: No, conteste. No lugar a la objeción. Conteste.
TESTIGO: Bueno, el edificio como tal no me molestarla] en nada.
POR EL LCDO. MARTINEZ LUCIANO:
P Eso es lo que ... los edificios como tal, no le molestan en nada.
R Como tal.
P ¿Y está conciente [sic] que lo que usted está impugnando en este caso es ese permiso de construcción y esos edificios? ¿Correcto?
R Unjú.
P No le afectan en nada.
R Los edificios no me molestan.
P No tengo más preguntas. Transcripción Vista Evidencia-ría 9 de noviembre de 2009, págs. 98-101.
Es en este testimonio que algunos miembros del Tribunal quedan convencidos de que el colindante-recurrido del caso de autos cumple con los requisitos de legitimación ac-tiva esbozados en nuestra jurisprudencia para conceder un injunction permanente. Respetuosamente, no comparto esa conclusión. Prima impressionis, este testimonio levanta diversas interrogantes y dudas sobre la naturaleza del daño alegadamente sufrido por el colindante que me impiden identificar un daño claro y palpable.
Ello es así porque, según este testimonio, quedan sin respuestas preguntas tales como: ¿Quiénes eran los alega-dos compradores de los terrenos desarrollados? ¿Qué evi-dencia, más allá de sus alegaciones(3) tiene el colindante sobre la razón de los alegados compradores para desistir de la venta? ¿Cuán serias fueron las ofertas de compra? ¿En qué etapa se encontraban las alegadas negociaciones *754 cuando los alegados compradores se enteran sobre “la cosa esa de los monos”? ¿Las alegadas ofertas fueron retiradas a causa de la construcción de los edificios de Bioculture o debido al futuro uso de estos? ¿Ha tenido otras ofertas desde que comenzó la construcción de Bioculture? Todas estas interrogantes me hacen imposible concluir que el ale-gado daño sufrido por el colindante es claro y específico: faltan eslabones en la cadena para demostrar que el daño es lo suficientemente rastreable hasta llegar a la construc-ción que lleva a cabo Bioculture en Guayama.
Peor aún, los posibles daños agrícolas que alega el colin-dante son la encarnación de la especulación. Es impresio-nante que ante estas dos (2) alegaciones, una especulativa y una que levanta más interrogantes que certezas, algunos miembros de este Tribunal concluyan que el colindante de-mostró sufrir un daño claro, específico y que no resulte abs-tracto, hipotético o especulativo. Meras opiniones y conclu-siones no pueden mágicamente conferir legitimación activa. No podemos permitir que las cuestiones de legitimación activa se conviertan en un “ingenioso ejercicio académico de lo concebible”. Lujan v. Defenders of Wildlife, 504 U.S. 555, 566 (1992), citando a United States v. Students Challenging Regulatory Agencies Procedures (SCRAP), 412 U.S. 669, 688 (1973).
Más preocupante resulta que algunos miembros del Tribunal le reconozcan legitimación activa a este recurrido cuando la tinta de un precedente tan reciente como Fund. Surfrider y otros v. A.R.Pe., supra, todavía está fresca. En ese caso sostuvimos que un demandante que alegó que una construcción en Rincón tendría el efecto de “ ‘rompe [r] la armonía y altera [r] las características de su vecindario’ ”, id., pág. 588, y que entendía que agravaría un problema de distribución de agua en la comunidad, no cumplía con los requisitos de legitimación activa. Sustentamos ese proce-der en que era insostenible reconocerle legitimación activa a una persona que presenta tales alegaciones tan impreci-sas y generales.
*755 La norma de Fund. Surfrider y otros v. A.R.Pe., supra, tiene que significar algo. No se puede sostener que pala-bras tan contundentes como “claro”, “específico” y daños “no hipotéticos, abstractos o especulativos” sean sellos cuyo significado está sujeto a lo que en determinado día en-tienda una Mayoría de los miembros de este Foro. “Este Tribunal debe ser puntillosamente consecuente con su pro-pia doctrina. No puede, como una Penélope jurídica, deste-jer en la oscuridad de la noche lo que tejió por el día .’’López y otros v. Porrata y otros, 156 D.P.R. 503, 529 (2002), opi-nión disidente del Juez Asociado Señor Fuster Berlingeri.
Nuestros precedentes no solo se mantienen vigentes mientras no sean revocados, sino mientras exista la con-fianza de que estos serán aplicados consistentemente por los tribunales, particularmente por este Tribunal. Me sos-tengo en que la alegación del colindante no cumple con el requisito de demostrar un daño claro, específico, palpable y no especulativo. A contrario sensu, es especulativa la con-clusión de que con treinta y cuatro (34) palabras en una transcripción de una vista evidenciaría, sin más, se le reco-nozca legitimación activa a una sola persona, lo cual tiene el efecto de paralizar permanentemente una inversión de mi-llones de dólares. No puedo validar con mi voto ese proceder.
III
Por otra parte, me veo en la obligación de expresarme en cuanto a la metodología de adjudicación utilizada por el Juez Asociado Señor Estrella Martínez en su voto de conformidad.
Los jueces debemos ser conscientes de la metodología que utilizamos para cumplir con la facultad que nos ha sido delegada por la Constitución y las Leyes. Obviamente, no existe un modelo de metodología adjudicativa perfecto e incuestionable. Después de todo, debemos recordar que la vida de la Ley no ha sido dictada por la lógica, sino por la *756 experiencia humana(4) Por ende, es de vital importancia que los juristas tengamos como base algún modelo de me-todología de adjudicación.
Mi metodología adjudicativa me obliga a resolver las con-troversias que se presentan ante este Tribunal utilizando el Derecho como única fuente. En el esquema constitucional en el que vivimos, la Rama Judicial debe velar por guardar celosamente su rol de resolver casos conforme a Derecho. Y lo que es el Derecho no se encuentra en ponencias que una agencia presentó ante la Rama Legislativa. Mucho menos son fuente de Derecho las decisiones de política pública que toma la Rama Ejecutiva. Todos estos son factores exógenos a las herramientas que contamos para resolver casos: la Ley escrita y nuestros precedentes.
La toga que ostentamos impide que nos convirtamos en entes formuladores de política pública. En nuestro es-quema constitucional, ese rol se le ha reservado a otras ramas del Gobierno. Así, cuando ante este Foro comparece una parte, y argumenta que en Derecho procede que se falle a favor suyo, no podemos utilizar fuentes que van más allá del Derecho para resolverle en contra. Estas fuentes contaminan la sagrada labor constitucional de este Tribunal.
Toda vez que conozco mi metodología adjudicativa y mi rol como Jueza, no puedo tomar una decisión amparándome en informes presentados ante la Cámara de Representantes ni especular en cuanto a simios ruidosos o fugitivos que de-vastan el panorama de la Isla, ni “adoptar” en el vacío las posiciones de agencias de la Rama Ejecutiva. No nos in-cumbe a nosotros como juristas “ser cauteloso [s] a la hora de permitir la introducción de una colonia de miles de primates que podrían causar serios problemas a la agricultura, a la seguridad y a las propiedades” de personas. Opinión de con- *757 formidad del Juez Asociado Señor Estrella Martínez, pág. 744. Ese juicio de política pública está exclusivamente enco-mendado a otras ramas del Gobierno. Nuestro rol es deter-minar si las actuaciones de estas Ramas han sido conforme al Derecho vigente. Respetuosamente, este augusto Tribunal no se puede convertir en una segunda Asamblea Legislativa. Tampoco debe regresar a un pasado en el cual se sustituía el juicio de política pública de otras ramas por el de una mayoría de miembros de este Foro. Véanse: Misión Ind. P.R. v. J.P. y A.A.A., 142 D.P.R. 656, 689 (1997), y Colón Cortés v. Pesquera, 150 D.P.R. 724, 789 (2000).
IV
En fin, la conclusión a la que hoy llega el Tribunal es altamente preocupante. Demuestra una falta de consisten-cia en la aplicación de nuestros precedentes recientes y, peor aún, fomenta un panorama de incertidumbre en cuanto a la rectitud de las decisiones de nuestras institu-ciones gubernamentales. Al igual que en otras ocasiones, “[e]sta controversia está matizada por un alto interés pú-blico y requiere de este Tribunal el más ponderado y sereno análisis jurídico, a fin de garantizar la seguridad jurídica y la estabilidad de nuestro ordenamiento legal, así como la confianza en nuestras instituciones gubernamentales, ad-ministrativas y judiciales”. San Gerónimo Caribe Project v. A.R.Pe., 174 D.P.R. 640, 644-645 (2008).
A su vez, debemos recordar que aunque el Art. 28 de la Ley Núm. 76, supra, ha sido derogado, cabe la posibilidad de que existan cientos de proyectos que estén siendo cues-tionados bajo las disposiciones de este. Con la conclusión a la que hoy llega el Tribunal, se permite que un solo colin-dante, sin ostentar legitimación activa, logre paralizar per-manentemente un proyecto de construcción en el cual se han invertido millones de dólares.
*758 De acuerdo con esta decisión, Bioculture queda perma-nentemente impedida de continuar construyendo su pro-yecto en Guayama. Ello a pesar de la expectativa que nues-tro ordenamiento le ha creado sobre la corrección de los permisos de construcción que posee. Debemos recordar que en enero de 2010, el Tribunal de Apelaciones dejó sin efecto el injunction permanente en el caso de autos y por dos (2) años permitió que Bioculture continuara su construcción(5)
Hoy el Tribunal valida un escenario shakespeariano en el cual a una parte que tiene permisos de construcción la llevan a los tribunales unos demandantes sin legitimación activa, a la cual un tribunal apelativo le reconoce altas probabilidades de prevalecer y, a posteriori, dos (2) años después le anuncia que su proyecto de construcción es ile-gal y le prohíbe permanentemente continuar con este. Res-petuosamente, la “Comedia de los Errores” no debería ser avalada por este Tribunal.
Aun cuando las revisiones de sentencias “se dan contra la decisión y no contra los fundamentos” (Voto de Confor-midad del Juez Asociado Señor Martínez Torres, pág. 15), hacemos un pobre servicio al ordenamiento si nuestros propios fundamentos son cuestionables y carentes de consistencia. No puedo avalar con mi voto este proceder.
Consecuentemente, declararía “ha lugar”, tanto las mo-ciones en auxilio de jurisdicción como los recursos de cer-tiorari presentados.

 Esta agencia fue reemplazada por la Oficina de Gerencia y Permisos, de acuerdo con el esquema establecido en el Art. 2.3 de la Ley 161-2009 (23 L.P.R.A. sec. 9012(b)).

 El trámite procesal ante el Tribunal de Apelaciones fue un tanto anómalo. De los autos surge que se presentaron Recursos de Apelación ante el Tribunal de Ape-laciones el 27 y 29 de enero de 2010. A posteriori, dicho foro emitió una Resolución el 29 de enero de 2010 en la cual declaró “ha lugar” dos mociones en auxilio de juris-dicción que presentó Bioculture y el Gobierno de Puerto Rico. El 16 y 25 de febrero de 2010 se presentaron los Alegatos en Oposición a los Recursos de Apelación, por lo cual el foro apelativo intermedio estaba en posición de resolver los recursos desde esa fecha. Sin embargo, los recurridos de epígrafe presentaron diversas Mociones para Suplemental- las Oposiciones al Recurso de Apelación, que incluían documentos y demás evidencia que no formó parte del trámite del caso ante el Tribunal de Primera Instancia. La presentación de estas Mociones Suplementarias se extendió hasta diciembre de 2010.

 Sabido es que las alegaciones hay que sustentarlas con prueba adecuada. Meras alegaciones no son suficientes, así como tampoco las conjeturas. Com. Vec. Pro-Mej., Inc. v. J.P., 147 D.P.R. 750 (1999); Pueblo v. López Guzmán, 131 D.P.R. 867 (1992); Henríquez v. Consejo Educación Superior, 120 D.P.R. 194, 210 (1987).

 Parafraseando el famoso pasaje del jurista Oliver Wendell Holmes: "the life of the law has not been logic; it has been experience.” 0. Wendell Holmes, The Common Law, 1881 (dominio público).

 En aquellas circunstancias en que se solicite ia paralización de los efectos de un injunction, hemos establecido que la solicitud debe cumplir con los siguientes requisitos: (a) que la parte peticionaria presente un caso fuerte con probabilidades de prevalecer en los méritos', (b) que sufrirá un daño irreparable si no se detiene la ejecución de la sentencia; (c) que la paralización no causará daño sustancial a las demás partes, y (d) que no se verá pequdicado el interés público. Véanse: Pantoja Oquendo v. Mun. de San Juan, 182 D.P.R. 101 (2011); Plaza Las Américas v. N & H, 166 D.P.R. 631, 642-643 (2005); Peña v. Federación de Esgrima de P.R., 108 D.P.R. 147, 154 (1978).